Filed 4/9/21  In re I.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.H., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.S., Defendant and Appellant. | E075341 (Super.Ct.No. J281353) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant and appellant, E.S. (Mother), is the mother of I.H., who was born in May 2019.  I.H. was taken into protective custody in June 2019, when I.H. was approximately six weeks old.  At the dispositional hearing on October 23, 2019, the juvenile court bypassed ordering reunification services for Mother, pursuant to Welfare and Institutions Code section 361.5, subdivision (b)(10).[1]

Mother challenges the court's June 9, 2020 order, summarily denying her petition to return I.H. to her care, or to grant her reunification services and liberalized visitation, among other relief.  (§ 388.)  Mother claims the court erroneously denied her petition without ordering a hearing on the petition.  We conclude that the petition did not make the prima facie showings necessary to require the court to order a hearing on the petition.  (§ 388, subds. (a), (d).)  Thus, we affirm the order denying the petition.

## II.  FACTS AND PROCEDURE

A.  *Prior Dependency Proceedings Involving Mother's Older Children*

In addition to her youngest child, I.H., Mother has four older children:  R.S., Lo.S., Li.S. (the S. children), and M.R.[2]  C.H. is the father of Mother's oldest child, M.R.  In December 2016, the S. children were removed from the custody of their father, G.S.,

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  R.S., Lo.S., and Li.S. were born in 2012, 2013, and 2014, respectively.  M.R. was born in 2008.

"due to physical abuse caused by [G.S.'s] girlfriend."[3] The S. children were not returned to or placed with Mother, "due to active domestic violence" between Mother and C.H. According to plaintiff and respondent, San Bernardino County Children and Family Services (CFS), Mother and C.H. had "a long history of engaging in domestic violence." Nonetheless, Mother and C.H. continued to "co-parent" M.R.

During the proceedings for the S. children, in February 2017, the juvenile court sustained jurisdictional allegations against Mother based on the active domestic violence between Mother and C.H. Mother reported several incidents of domestic violence between herself and C.H. between June 21 and June 28, 2016. On June 28, 2016, Mother "received a 'couple of bruises,' " called the police, and was taken to the hospital. According to Mother, C.H. went to jail for 16 days and had to complete a 52-week domestic violence course. A "no contact" order was in place, prohibiting any contact between the S. children and C.H.

Mother was offered reunification services for the S. children, including individual counseling, parenting, and domestic violence classes. Mother completed her parenting classes in December 2016, her domestic violence classes in June 2017, and her individual counseling in October 2017.

---

[3] On August 15, 2016, a family law court granted G.S. sole legal and physical custody of the S. children, due to concerns of domestic violence between Mother and her boyfriend, C.H., in June 2016. A family law court "child custody recommending counselor" reported concerns about Mother's continued contacts with C.H. and that C.H. may have been living with Mother.

In late 2017, Mother said she understood CFS's concerns regarding her history of domestic violence with C.H. Mother said that her "main priority" was to provide a stable home for her children, and that part of providing a stable home was being aware of people who could be a safety threat to her children. Mother said she would not allow C.H. to be around the S. children unless CFS approved and monitored the contacts, and Mother claimed she had no plans to begin another relationship with C.H.

In January 2018, while Mother was having extended, unsupervised visits with the S. children, Mother reported that she ran into C.H. at church. Mother was concerned about the no contact order between the S. children and C.H., because they had a child together, M.R., who was not a juvenile court dependent and with whom C.H. had contacts. Mother then asked CFS whether the no contact order for C.H. could be modified to a "no negative contact" order. CFS advised Mother that she would have to follow the no contact order between the S. children and C.H. In February 2018, CFS developed a safety plan regarding "child care" and the no contact order. C.H.'s mother, Ms. E., agreed to transport M.R. to C.H. for visits, and Mother and C.H. agreed to split their attendance at M.R.'s school functions. This way, Mother and the S. children would not have to have any contact with C.H.

Later in February 2018, Mother was "upset" about the no contact order when she met with CFS, and she again asked that it be modified to a no negative contact order. After further discussion, Mother again agreed to follow the no contact order. In April 2018, the S. children were returned to Mother pursuant to a family maintenance plan, with the understanding that Mother would comply with the no contact order.

4

In May 2018, CFS received a report on its hotline, alleging Mother's and C.H.'s physical and emotional abuse of M.R., then age nine. The referral was determined to be unfounded, and Mother was "taking the necessary medical steps to address [M.R.'s] medical needs."

On July 31, 2018, CFS received a report that C.H.'s parole officer had gone to Mother's home and that C.H. was in the home. On August 8, 2018, two social workers made an unannounced visit to Mother's home and spoke to Mother about C.H.'s recent presence in the home. Mother said C.H. "showed up" at her home on August 3, and she called his parole officer, who came to the home and arrested him. Mother said that C.H. was not invited to the home and was supposed to be in jail for the next 90 days. According to Mother, C.H. had been sober for 36 days but began using drugs again and was kicked out of his substance abuse treatment program. Mother said she did not want C.H. to jeopardize her case with the S. children, and she knew that allowing C.H. to have contact with the S. children would violate the no contact order. Mother said she still loved C.H., he loved her, and he was supposed to complete his substance abuse treatment.

After social workers interviewed the older S. children, who were reluctant to answer questions about C.H., Mother insisted that C.H. had not been to her home other than during the previous week. Mother further explained that C.H. came to her home around 10:00 p.m. on August 2; she spoke to him outside and asked him to leave; he returned the next morning at 8:00 a.m., and she allowed him to come inside because she

did not want him to become "irate." Then she called his parole officer and had him arrested.

On August 10, 2018, CFS contacted C.H.'s parole officer, who reported that C.H. had left a residential substance abuse treatment program on July 14, 2018. On July 26, Mother, C.H., "and children" came to the parole officer's office and asked that Mother's home be approved for C.H. to live in with Mother and the children. On July 27, the parole officer went to Mother's home to approve the home, and Mother, the children, and C.H. were present. On August 1, the parole officer arrested C.H., and C.H. was expected to be released from jail on August 11.

Mother later complained to CFS because, on August 16, 2018, CFS interviewed the older S. children at their school concerning whether they had seen C.H. Mother complained that CFS was treating her like "a criminal" due to her past relationship with C.H. Mother said she was no longer in a relationship with C.H., but she admitted that she had a "lapse of judgment" when she asked that her home be approved for C.H. to live in, with the children, while he was on parole.

On August 24, 2018, CFS received police reports concerning a June 15, 2018 "domestic dispute" between Mother and C.H. It was reported that Mother was sitting in the front seat of a car, crying, while C.H. was sitting in the back seat and punching Mother in her head. C.H. then went into Mother's home, "brought out two (2) children, and left the property." Mother and C.H. told police that C.H. was not hitting Mother; rather, he was "hugging Mother and comforting her" because her children were "in CPS."

6

On August 27, 2018, CFS obtained a detention warrant and removed the S. children and M.R. from Mother "and Fathers." When CFS and sheriff's deputies arrived at Mother's home to serve the detention warrant, Mother "became irate," attempted to leave in her car to get the children from school, and struck the deputies after she refused to get out of her car. Mother was arrested and charged with resisting arrest. (Pen. Code, § 69.) Mother later apologized to the deputies, saying she was "very upset" and did not usually behave that way.

CFS then spoke with G.S.'s stepmother, Ms. S., who confirmed that Mother and C.H. were still engaging in domestic violence. Ms. S. had recently gone to Mother's home to visit the children and asked the children what had happened to the television, which was no longer on the dresser where it was previously. One of the children told Ms. S. that C.H. had pushed Mother into the television and it fell on the floor.

Mother was in county jail on her resisting arrest charge from August 27 to September 11, 2018. She entered a no contest plea in the case, was placed on probation, and was required to serve 270 days in jail on weekends. On September 13, CFS spoke with C.H., who claimed he did not know there was a no contact order prohibiting him from having any contact with the S. children, although he admitted that Mother told him he could not be around either Mother or the S. children, or the S. children would be removed from Mother.

C.H. also admitted he had a drug problem; he had been sober for two months; he was in outpatient treatment; he attended meetings; and he had a sponsor. He said he had recently been smoking methamphetamine but stopped using heroin eight months earlier.

He had been to two inpatient programs—attending one in 2016, which he left after 14 or 15 days because he was "not ready to get sober." He was kicked out of his more recent program after "someone tried to steal his stuff" and hit him.

C.H. again denied that he was in a relationship with Mother or that he and Mother had engaged in any recent domestic violence. He claimed that their last incident of domestic violence occurred in 2016. He said he was on parole for residential burglary "because his previous wife said he broke into her house." He "went to prison for two (2) years in March 2015," and he was hiding from law enforcement before he went to prison. He went to Mother's home to get his clothes after Mother was arrested in August 2018.

Also on September 13, 2018, Mother told CFS that she understood that C.H. was "the problem"; she was taking the necessary steps to remove C.H. from her life; and she would participate in a domestic violence program. Mother said she "messed up" and needed more counseling and supportive services. Still, Mother denied any current domestic violence between herself and C.H. And, like C.H., Mother claimed that during the June 15, 2018 incident, C.H. was hugging her, contrary to a neighbor's report that he was punching her in her head.

Later in September 2018, CFS reported that Mother had completed her services in the S. children's case, but it recommended terminating Mother's services on the ground she would not benefit from additional services. On November 1, 2018, the court terminated Mother's services in the S. children's case. On November 28, 2018, Mother and C.H. were denied reunification services for M.R., pursuant to section 361.5, subdivision (b)(5), (7), and (10).

On November 18, 2018, C.H. was detained while sheriff's deputies executed a search warrant at a home in Barstow in connection with the investigation of a person suspected of selling controlled substances. Inside the garage, deputies found large quantities of suspected methamphetamine, a large quantity of syringes, and other indicia of methamphetamine sales. There was also a smoky haze in the garage but no cigarette smoke. At the scene, C.H. claimed it was the first time he had been to the Barstow home, and another person had invited him there to assist with a task. He was released at the scene. On November 27, 2018, C.H. admitted a parole violation and was returned to jail in January 2019.

B. *The Current Dependency Proceedings for I.H.*

1. Detention

As indicated, I.H. was born in May 2019. On June 4, 2019, CFS received a referral alleging that I.H.'s parents, Mother and C.H.,[4] had a history of domestic violence and that C.H. had a history of abusing methamphetamine and heroin. Mother and C.H. had been living together in a trailer since March 2019, following their releases from county jail.[5] C.H.'s mother, Ms. E., had assisted Mother and C.H. in obtaining their housing.

---

[4] In September 2019, C.H. took a paternity test, which showed that he was not I.H.'s biological father. Mother identified two other possible biological fathers for I.H.

[5] Mother was in jail completing her 270-day sentence from October 24, 2018 to February 14, 2019. C.H. was in jail for a parole violation from January 3 to March 12, 2019.

Mother reported that C.H. was the father of I.H., and that Mother and C.H. did not "hit each other anymore." They were attending counseling and it had "helped." They were also attending weekly support group meetings, and Mother was a secretary at local Alcoholics Anonymous (AA) meetings. Mother denied that she or C.H. were using drugs, and C.H. was being drug tested weekly.

I.H. was receiving assistance through the Cherokee Nation because C.H. was a registered member of the tribe, and I.H. had recently had her "1-month checkup." Mother was breastfeeding I.H. and feeding the child formula.

On June 10, 2019, Mother and C.H. signed a form, authorizing CFS to temporarily detain I.H. On June 13, the court ordered I.H. detained and placed with Ms. E. Pending a jurisdictional and dispositional hearing, the court authorized CFS to provide reunification services to Mother and C.H., although the court noted that the services could be bypassed. The court directed the social worker to facilitate Mother's continued breastfeeding of I.H.

2. Jurisdiction and Disposition

On July 23, 2019, the court sustained the allegations of a section 300 petition for I.H.[6] The court sustained three "failure to protect" allegations (§ 300, subd. (b)), based on Mother's and C.H.'s histories of domestic violence with each other and C.H.'s substance abuse history. The court also sustained two "abuse of sibling" allegations (§ 300, subd. (j)), based on (1) the December 2016 removal of the S. children from Mother

---

[6] Mother and C.H. did not contest the allegations.

10

"due to the Mother engaging in domestic violence with [C.H.]," (2) the November 1, 2018 order terminating Mother's services for the S. children (collectively, the j-4 finding),[7] (3) the August 2018 removal of M.R. from Mother, due to Mother's domestic violence with C.H., and (4) the November 28, 2018 order bypassing services for Mother and C.H. in M.R.'s case (§ 361.5, subd. (b)(5), (7), (10)).

On July 8, 2019, the Cherokee Tribe intervened in I.H.'s case. But, at the dispositional hearing on October 23, 2019, the Cherokee Tribe withdrew from I.H.'s case after paternity test results showed that C.H. was not I.H.'s biological father. On October 23, the court found that C.H. was a "non-party" and ineligible for reunification services.[8] The court bypassed reunification services for Mother, pursuant to section 361.5, subdivision (b)(10), and scheduled a section 366.26 hearing. Mother was allowed supervised visits with I.H., twice monthly for two hours.

---

[7] The j-4 finding is in error to the extent it states that the S. children were removed from Mother in December 2016 due to Mother's domestic violence with C.H. Although the record in this appeal does not include the complete record of the proceedings for the S. children, the record indicates that the S. children were "originally removed" from their father, G.S., in December 2016 "due to physical abuse caused by [G.S.'s] girlfriend." The record also indicates that the children were *not placed* with Mother in December 2016 due to Mother's "active domestic violence" with C.H. There is no indication that this error in the j-4 finding affected any of the subsequent proceedings in this case.

[8] C.H. filed a writ petition, challenging the court's failure to find that he was the presumed father of I.H. This court denied the petition in *C.H. v. Superior Court of Riverside County* (Jan. 16, 2020, E073959 [nonpub. opn.]) (*C.H.*). Our opinion in *C.H.* erroneously indicates, consistent with the j-4 finding, that the S. children were removed from Mother in December 2016 due to Mother's domestic violence with C.H., when, in fact, the S. children were *not placed* with Mother in December 2016 due to Mother's domestic violence with C.H. (*C.H.*, *supra*, E073959; see fn. 5, *ante*.) This error was immaterial to our decision in *C.H.*

Before the October 23, 2019 dispositional hearing, CFS reported that, since August 2019, Mother had completed eight counseling sessions, 12 sessions of a domestic violence support group, and "foster and Kinship Care education." On September 30, 2019, Mother began living in a sober living home through New Hope Village, Inc. On October 28, 2019, Mother was to begin full-time employment as a warehouse specialist.

In January 2020, CFS reported that Ms. E. and her husband, Mr. E., were willing to adopt I.H., who had been placed with them since June 2019, and recommended adoption as I.H.'s permanent plan. On May 26, 2020, Ms. E. reported that Mother had been consistent with her visits with I.H., the visits were positive, and Mother was attentive to I.H. and the child's needs. Mr. E. reported, however, that Mother was still involved with C.H., and Mr. E. felt that Mother "had more caring and love" for C.H. than she did for her own children. The section 366.26 hearing for I.H. was ultimately continued to June 9, 2020.

### 3. Mother's Section 388 Petition (June 9, 2020)

On the day of the section 366.26 hearing, June 9, 2020, Mother filed a section 388 petition, asking the court to return I.H. to her care or, alternatively, vacate the section 366.26 hearing, grant her reunification services, increase the frequency of her visits, and allow her unsupervised visits. In support of her petition, Mother showed that she had completed "additional classes to address her case issues," including parenting and domestic violence classes, and she explained how she had benefited from the classes. Mother also showed that she had been having weekly individual counseling sessions since February 2019, addressing issues including domestic violence and her trauma from

12

being sexually abused as a child. On October 22, 2019, she completed a 12-session post-traumatic stress disorder class to address her childhood trauma.

Mother also showed that she had been living in a sober living home since October 9, 2019, and she had been taking random monthly drug tests as a condition of living in the home. She had been sober for more than 16 months. Through her sober living home facility, she had learned financial and personal skills. She had consistently attended AA meetings since March 2019, and she had a sponsor. She had full-time employment, and she was dedicated to providing her children with the tools and guidance they needed.

Mother claimed she had a strong bond with I.H., even though, on October 23, 2019, the court decreased the frequency of her visits from three times weekly for three hours, to twice monthly for two hours. When I.H. was born in May 2019, both I.H. and Mother were healthy. Mother claimed that she understood why she lost custody of her children, and she accepted responsibility for failing to protect them. She asked the court to give her the opportunity to show that she had changed.

On June 9, 2020, the court summarily denied Mother's petition, without a hearing, on the grounds (1) the petition did not state new evidence or changed circumstances, and (2) the proposed changes of prior orders would not promote the best interest of I.H. (§ 388, subds. (a), (d).) Later on June 9, the court conducted the section 366.26 hearing, terminated parental rights, and selected adoption as I.H.'s permanent plan, after rejecting Mother's claim that the parental benefit exception to the adoption preference applied. Mother appealed the June 9, 2020 orders.

13

### III. DISCUSSION

Mother claims the juvenile court acted "unreasonably and arbitrarily" in denying her section 388 petition without a hearing. We conclude that Mother's petition was properly denied without a hearing.

Section 388 provides: "(a)(1) Any parent . . . having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . . [¶] . . . [¶] (d) If it appears that the best interests of the child . . . *may* be promoted by the proposed change of order . . . the court shall order that a hearing be held . . . ." (Italics added.)

A section 388 petition "need only allege a prima facie case in order to trigger the right to proceed by way of a full hearing." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 592.) That is, the petition must make a prima facie showing of facts sufficient to sustain a favorable decision on the petition if the facts are credited or assumed true. (*In re Edward H*, at p. 593; *In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) The petition must be liberally construed in favor of its sufficiency. (*In re K.L.* (2016) 248 Cal.App.4th 52, 62; Cal. Rules of Court, rule 5.570(a).) That is, the petition must be "liberally construed in favor of granting a hearing to consider the parent's request." (*In re Marilyn H.*, *supra*, at p. 309.)

" 'There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.] If the liberally

14

construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing. [Citation.] We review the juvenile court's summary denial of a section 388 petition for abuse of discretion.' " (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)[9]

The juvenile court did not abuse its discretion in denying Mother's section 388 petition, summarily and without a hearing. As the court found, the petition did not make a prima facie showing of (1) changed circumstances, or (2) that granting Mother reunification services and liberalized visitation, or returning I.H. to her care, would serve the best interests of I.H. (§ 388, subd. (a).)

Regarding changed circumstances, many of the services that Mother completed and relied on in her petition as showing changed circumstances were actually completed by Mother before the October 23, 2019 dispositional hearing, when the court bypassed ordering reunification services for Mother pursuant to section 361.5, subdivision (b)(10). Mother had also completed many similar services, including parenting and domestic violence classes, and individual counseling, in 2016 and 2017, long before her older children (the S. children and M.R.) were removed from her care in August 2018.

---

[9] Mother claims that the applicable standard of review from an order denying a section 388 petition without a hearing is, or should be, the de novo standard. Mother's position is contrary to the established case law. (See, e.g., *In re K.L*, *supra*, 248 Cal.App.4th at p. 62.) Contrary to Mother's argument, the court in *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, at pages 1413 to 1417, expressly applied the abuse of discretion standard, not the de novo standard, in reviewing an order denying a section 388 petition without a hearing.

15

Mother is to be commended for participating in further services, on her own, after October 23, 2019; for continuing to live in her sober living home since October 2019; for maintaining full-time employment since October 2019; and for undertaking so many efforts to improve her life and to be a better parent to her children. But, at the time Mother filed her section 388 petition on June 9, 2020, the record showed that Mother was still involved with C.H. In May 2020, Mr. E., who, along with Ms. E., supervised Mother's visits with I.H., reported that Mother was still involved with C.H. and "had more caring and love" for C.H. than she did for her own children. In her petition, Mother did not deny that she was still seeing C.H. It was Mother's burden to make a prima facie showing of changed circumstances.

The principal reason for I.H.'s dependency was Mother's and C.H.'s histories of engaging in domestic violence with each other. Mother's older children were removed from her care in August 2018 based on the same concerns. Given the years-long history of domestic violence between Mother and C.H., the juvenile court reasonably determined that Mother's section 388 petition did not make a prima facie showing of changed circumstances. (§ 388, subd. (a).)

The juvenile court also reasonably determined that Mother's petition did not make a prima facie showing that granting Mother reunification services, or making any of the other changes of orders Mother requested, would have served the best interests of I.H. (§ 388, subd. (a).) I.H. was 13 months old when Mother filed her section 388 petition on June 9, 2020. I.H. had been living with Mr. and Ms. E. since she was taken into protective custody at six weeks old in June 2019, and the E.'s were willing to adopt her.

16

Notwithstanding Mother's assertions to the contrary, substantial evidence clearly supported the juvenile court's determination that Mother had continued her relationship with C.H., although that relationship, and the domestic violence arising out of it, were the facts that led to the removal of the S. children from Mother as well as I.H. from Mother and C.H. in the first place. The juvenile court could have reasonably concluded that being raised in such a family dynamic would not be in the best interests of I.H.

" '[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) [But] '[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' (*Id.* at p. 309.)" (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447.) Thus, I.H.'s need for permanency and stability "took priority" over Mother's interests in reunifying with the child when Mother filed her section 388 petition seeking I.H.'s return to her or further services. At the time of the juvenile court's denial of the section 388 petition, I.H. had been in a stable home for all but approximately the first six weeks of her 13 months of life. The trial court could have reasonably concluded that this stability, and not an uncertain future, was in the best interests of I.H.

## IV.  DISPOSITION

The June 9, 2020 order denying Mother's section 388 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____

J.

We concur:

MILLER _____

Acting P. J.

MENETREZ _____

J.